On the Merits.
By Division C, composed of OVERTON, ST. PAUL, and THOMPSON, JJ.
THOMPSON, J.
This case involves the proper interpretation to be placed on a deed which conveyed “all the pine timber” on a body of land comprising 9,290 acres, the timber being estimated at 51,600,000 feet, and the price being at the rate of $1.50 per thousand feet.
The timbered land was owned by Babington Bros., and was segregated into two separate estates by the sale of the timber to the Greenlaw Lumber Company on September 5, 1903. The land was later conveyed to the Central Trust & Savings Bank, and from the latter to the plaintiff herein.
The Greenlaw Lumber Company operated a large sawmill which was located some 28 miles from the main body of the timber, and spur tracks and tramways were built out into the timber over which and by means of which the timber was conveyed to the mill. After cutting the timber suitable to be manufactured into lumber off a particular tract, operations would be transferred to another tract. The greater part of the timber was cut and removed and sawed into lumber, when the Lumber Company failed. The mill plant and timber holdings were sold, under *847 judicial proceedings in the federal court, to R. E. Cave, and he sold the remaining timber on a designated part of the land to the present defendant.
The plaintiff contends that only such trees as were, at the time of the timber deed, suitable for cutting into sawlogs, under the custom and practice then prevailing and in use by saw mills in the section where the lands were located, were included in the deed, and were intended to be conveyed; that the sale did not include the tops of the trees, nor small saplings, lightwood, and pine knots.
On the other hand, it is the contention of the defendant that he acquired not only all the growth of pine of every size, kind, and character, but all the treetops left on the land by former owners, and all of the lightwood and pine knots suitable for any purpose whatever, and that he had the legal right to take and to make such use of the same as he pleased. He was proceeding to carry out his construction of his purchase, and was erecting,' or intended to erect, houses upon said land for the purpose of operating coal kilns and of converting all of such timber by-products into pulp and charcoal when he was stopped by this injunction.
The district judge, after hearing the evidence, adopted the 'Contention of defendant, dissolved plaintiff’s injunction, and condemned the plaintiff in the sum of $1,250 damages.
It is conceded that either party had the right to introduce evidence to show the real intent of the parties to the timber deed and to explain the meaning of the term “pine timber” as used in the deed. The evidence shows that before the sale the Lumber Company caused an estimate to be made of all the standing pine trees on the land measuring 12 inches or more in diameter 2 feet above the ground. No trees under that dimension were taken into account, and the price paid and agreed to be paid was based on that estimate. The deed itself expressly declares “that the timber standing thereon and hereby conveyed” amounts to 51,600,000 feet. It is also shown that at the date of the sale in question it was practically the universal custom in the locality of this timber, with but few exceptions, to sell only such timber as could be manufactured into lumber with profit, and it is a fact that the Greenlaw Lumber Company during its entire operations did not cut and saw into lqmber any timber smaller than 12 inches in diameter 24 inches above the ground. Nor did that company in purchasing the timber on the land here involved intend or expect to use any timber under the given dimensions.
The president of the company states, it is true, that he felt that he was purchasing all the timber that was on the land, and that there would be no question raised as to any timber that the mill would use; still he 'says that he did not anticipate using any small trees and did not use any under 12 inches from the land in question. He did not consider trees under 12 inches commercial, and they were unprofitable. There were other witnesses who testified to the same effect.
[4] In view of the statement in the deed “that the timber standing thereon and hereby conveyed amounts to 51,600,000 feet,” and that the amount of timber tnus conveyed was based on an estimate of the standing trees measuring 12 inches in diameter 24 inches above the ground, and taking into consideration the testimony of the parties as to their construction of the terms of the deed and the custom prevailing among timber dealers at the time, our conclusion is that it was the intention of the seller to sell and of the buyer to buy only such timber as was then suitable to be manufactured into lumber, or that might become suitable to be so manufactured at any time during the period of 20 years in which the purchaser was given” the right to cut and remove the said timber'. The pur *850 chaser could not be restricted to tie size of the timber suitable to be sawed into lumber at the date of the contract. He had 20 years within which to cut and remove the timber, and all trees which from growth became suitable to be manufactured during that period were included in the purchase.
The deed, however, did not carry with it a grant of the saplings and undergrowth which WOUI5I remain such at the end'of the license period. Nor did it include any of the pine timber not suitable for lumber, nor any of the pine knots or pine tops, however valuable they might be for other purposes.
At the time of the original timber deed there was no market- for pulpwood, charcoal, pine knots, or cross-ties in that section of country, and neither the seller nor the buyer had any thought that such things would become commercial at any time in the future. It would be unreasonable, in the light of the facts, to hold that a sawmill company, extensively engaged in manufacturing lumber for the market, in purchasing pine timber for that exclusive purpose, contemplated using the small saplings, pine knots, and treetops for conversion into pulp for making paper or into charcoal, a business entirely foreign to that in which the lumber company was engaged, and a business not then even remotely thought of in that immediate section of the country.
While the ojuestion is res nova in this state, the interpretation we have placed on the word “timber” as used in the contract is in perfect accord with the text-writers and the adjudications of many of the other states.
Thus the term “timber” has been generally defined to mean that sort of wood which is proper and suitable to be used for the construction of buildings, tools, utensils, furniture, fences, ships, and the like. The word “timber” is also. used to signify standing trees suitable for the construction of dwelling houses, ships, and the like. See note to Balderson v. Seeley, 19 Ann. Cas. p. 1049. Timber, in its primary meaning, as given by Webster, is that sort of wood which is proper for buildings, etc.
In Lord v. Meader, 73 N. H. 185, 60 Atl. 434, it was said that in this country the term “timber,” when applied to standing trees, generally means such as are suitable for use in the erection of buildings, or in the manufacture of tools, utensils, furniture, carriages, fences, ships, and the like. The word does not denote trees which are suitable only for firewood or cordwood. And cross-ties are not timber when hewn and ready for use within the meaning of a grant of timber to be removed in a certain specified time, as held in Johnson v. Truitt, 122 Ga. 327, 50 S. E. 135; Butler v. McPherson, 95 Miss. 635, 49 South. 257.
It has been held that a deed reserving all-pine and hemlock timber, and specifying no time of removal, reserves only timber then having a market value and suitable for use, that is large enough for use as timber; and not such as may thereafter become large enough. Huron Land Co. v. Davison, 131 Mich. 86, 90 N. W. 1034.
The rule recited in 17' Ruling Case Law, p. 1094, is that, where there is nothing to indicate that the contract was made with reference to any construction of the word “timber” peculiar to the locality, and the parties appear to have used the term in its ordinary meaning, it is generally held that firewood is not included; nor does the reservation in a grant of real estate of the timber growing upon the property include saplings and undergrowth which at the time of the grant are not of a size suitable to make lumber.
Many more authorities might be cited to the same effect, but we deem it unnecessary to do so. To our minds it' seems perfectly clear that the word “timber,” in its ordinary, *852 everyday use, when applied to standing trees, means such trees only as are suitable to be made into marketable and commercial lumber, and that is the sense in which the word was used in the sale in question. The word as used could not have been intended to include saplings and undergrowth, nor “old field pine" which had grown up in fields that had been in cultivation only a few' years before the sale. Nor was it intended to include pine knots and old decaying treetops, the home of the wood-boring “sawyer.” It is to be noted in this connection that all of the treetops which the defendant proposed to take off said land were tops left on the land years before when the timber was cut and removed by the lumber company.
Under the terms of the contract as we construe it, the defendant was clearly without legal right to go upon plaintiff’s land for the X>urpose of converting the saplings, undergrowth, pine knots, and treetops into charcoal or pulp or for any other purpose.' He had the right to cut and remove the pine timber 12 inches or more in diameter 24 inches above the ground, and from exercising this right he was hot enjoined.
It is claimed in the petition that the defendant cut and removed from the land 33 cords of pulpwood of the value of $49.50 and the evidence sustains the claim. Indeed, the fact is admitted by the defendant.
It results from what has been said that the judgment will have to be reversed.
It is therefore ordered and decreed that the judgment appealed from be, and the same is, annulled, reversed, and set aside; and it is now ordered and decreed that the injunction herein sued out be perpetuated, and that plaintiff have judgment against the defendant’ for the sum of $49.50 and all costs of both courts. It is further ordered that all demands of defendant in reconvention be rejected.